Before we get started, Ms. Maynard and Mr. Waxman, the Court has decided to give each of you five extra minutes, and you can proceed, Ms. Maynard, when you're ready. Thank you, Your Honor. Mr. Chief Justice, and may it please the Court, the Biosimilars Act created a comprehensive and self-contained scheme for the early resolution of patent disputes. Regardless of the actions an applicant or sponsor take along the way, the end result is the same, patent litigation. Courts should apply that comprehensive scheme as written. They shouldn't look elsewhere for consequences. I'd like to start with the issue in Sandoz's petition, our petition, the notice of commercial marketing issue, and then turn to the issue in Amgen's petition, the information exchange. The Federal Circuit misread the notice of commercial marketing provision. To provide sponsors a 180-day automatic stay that's nowhere in the statute, that ruling will wrongly delay the marketing of every Biosimilar, even when there are no patent rights left to them. Can you tell me, suppose that in year two of the 12-year exclusive period, the application for the Biosimilar is made, and then in year four, they take more years to run, the FDA decides that it's going to approve it. Is it licensed at that time, or is it not licensed until the very end of the 12-day period? The FDA cannot license a Biosimilar until the end of the 12-year period, and actually, a sponsor can't apply for a Biosimilar license until year four, at the end of year four. As a practical matter, though, Justice Kennedy, it takes 8 to 10 years to develop Biosimilar, so it would be very rare. If the approval is done in year six or year seven, is that announced publicly, that the approval is done? The statute prohibits the FDA from making an approval effective, and that's in the statute, Your Honor, at K-7. It's the exclusivity provision that you're referring to. It prohibits the FDA from making the license effective until 12 years have run. That's the exclusivity period. I'm sorry, would you clarify, does that mean that the FDA can't announce its intent to approve on year 12 plus one earlier than year 12? Or, I'm not quite sure I understand, how long does it take for the FDA to approve the Biosimilar? Assuming you go through phase one and phase two has been finished, those run independent of the FDA approval, correct? That's right. The information exchange and the patent litigation process is completely separate and delinked from the FDA process. I want you to go back to Justice Kennedy, but I just want to get a sense of timing. How long does it generally take for the FDA to say, this is okay, effective, 12 plus one? So, two points about that, Justice Sotomayor. To answer your question, the FDA has said that it takes about, they're aiming to try to approve Biosimilar applications within 10 months of application. But there's nothing in this Act, in contrast to the Hatch-Waxman Act, that expressly allows the kind of tenant approval that I think both of you are asking about. And I think you may be asking about the fix that the Federal Circuit suggested for the problem they've created in the... No, no, no. Okay. I'm trying to get the process down. Okay. It takes them 10 months. Yes, Your Honor. Let's assume you put in an application in year four. Do they have to wait until when to announce that it's okay? They can't, under the statute, under K-7, they can't make it effective. Can't make the approval effective until year 12. When did they tell you that they would? Well, there's nothing in the statute that it calls for an approval before year 12. I mean, do they get a phone call? They say, hey, good news, we've got it approved. In five years, you're going to be able to mark it. I mean, how does it work? No, Your Honor. Incidentally, when you're talking about K, can you give me the citation and the appendix to the blue brief? Yes, Your Honor. So I'm looking at, in the blue brief, it's 24A. 24A, thank you. Exclusivity for reference product. And it says, effective date of biosimilar application approval. The approval of an application under this subsection may not be made effective by the Secretary until the date, that is 12 years after the date on which the reference product was first licensed under subsection A. That's the reference product biologic sponsor. So the statute does not allow the FDA to approve the biosimilar until year 12, until the exclusivity period has run. The statute also does not expressly allow any tentative approval, unlike the Hatch-Wax-Mac, which does say you can call in advance and say, you know, you're tentatively approved. But even in the Hatch-Wax-Mac, the government doesn't consider it licensed, which is the word in the statute in the marketing provision. I have one more question. Yes, Your Honor. And then I'll subside. It seems to me that this aspect of the process cuts against you insofar as the 180 days notice. I'm not sure I understand the premise of your question, Justice Kennedy. Well, the 180 days has to run from some time. And it seems to me that it has to run from the time that it's licensed, based on what you're telling me. No, Your Honor. So I'd like to turn to the text, then, of the notice of commercial marketing provision, because I think the text forecloses that reading. The text of the commercial marketing provision has one and only one timing element. It requires notice at least 180 days before the date of the first commercial market. Yes, but there is what you are to notice about. What does this notice say? And what it says is what you have to provide more note later than 180 days is notice of maybe, it doesn't even say this, it's not a complete sentence, of the first commercial marketing of the biological product licensed. Now, how could you do that if you don't know what the product licensed is? And I take it that they have in the agency. This goes to an agency, doesn't it? And I have in the agency, they have the authority to say, we will license this provided it's made this way, but not that way. Provided you do this kind of a check, but not that kind of a check. They have a lot of power over what is licensed. So how can you provide notice? By the way, maybe that isn't what notice means. Maybe it just means notice that you will commercially market X. Or maybe it means some combination thereof. The reason that I point to that ambiguity, which to me is a crucial ambiguity, and it has to do with both your arguments, indeed all of them on both sides, there is an agency here, isn't there? All right, now, we are being asked to interpret very technical provisions that I find somewhat ambiguous and operating in a field I know nothing about. But it's going to have huge implications for the future. So why isn't the way to go about this case to ask the agency to issue some regulations? Then when we see their interpretation, you all will be able to argue that their interpretation exceeds the statutory delegation. And by doing that, we would have a better picture. Well, I think, Your Honor, to take the text, which is where I think the court should look for the answer to this question, on page 39A of the blue brief is the Notice of Commercial Marketing Provision. And it says, as you raised, the subsection K applicant shall provide notice to the reference product sponsor, not later than 180 days before the date of the first commercial marketing. But the 180 days, Justice Breyer, modifies the date of first commercial marketing. Yeah, that's true. But what? What is it due to provide notice of? Of the biological product licensed under subsection K. But this statute uses that phrasing to describe the biosimilar. But you've just said and answered my question that the license doesn't happen until 12 years plus one. Well, the license can't happen until 12 years plus one, Justice Kennedy. But, like, right now and for years to come, the exclusivity period has already run. And so when applications are made, as it was here, we expect it to be licensed within 10 months of application and were, in fact, licensed. So when Sandoz gave the notice here and said, we expect to be licensed in the first quarter or second quarter of next year, Sandoz was licensed. So if your question is earlier, Justice Kennedy, we're getting to, does the applicant have an idea how its application is faring? Does the applicant know when to expect it's going to get approved? The answer to that is yes. And Congress didn't show any concerns with litigation too early. So to your purpose question, Justice Breyer, the purpose of this statute is to allow early resolution of passage. Justice Breyer's question was about agency regulations. That's right. Well, with respect, Mr. Chief Justice, the United States is here explaining its reading of the statute and agrees with our reading. Enough. I would find an explanation far more convincing as a layperson if, in fact, there had been notice and comment proceedings before an expert agency, which, in fact, having heard all the different views on what that word notice means and having figured out whether if we allow day one notice, what's going to happen is we're going to gut the possibility of people going in and making these exchanges because everybody will be too free under whatever this is, 9A, to go and start bringing declaratory judgment actions. And somebody will make that argument. Somebody will make the opposite. And we'll know what we're doing. All right. So that's the only thing the Chief Justice said. We know two things from the text of the statute, though, Your Honor. One is that the 12-year exclusivity period was set by the Congress and said the FDA can make a license effective at the 12-year point. If the Federal Circuit's reading is right, that license is not effective, not effective in any case, even when there are no patent rights, until 12-and-a-half years. Can I go back to the beginning of Justice Breyer's question? He made an assumption that until the approval of the product, that the other side won't know exactly what it is that's going to be approved, particularly in a situation like this where you've kept your application from them, so they don't have it. Address that issue. In your brief, you say they can get it. They can get it from the industry, from the FCC filings, from FDA talk, all of that stuff. But that won't tell them exactly what it is that you're intending to market. Or the other side, how would you know? If you start a declaratory judgment action, as you're entitled to do, wouldn't you know then? Couldn't you get it in discovery? Exactly, Your Honor, and that's our point. So that's exactly the consequence Congress provided when someone failed to provide notice or doesn't provide the application. So here, Sanders didn't provide its application, as you note. And that allows Amgen to sue. There are two acts of artificial infringement created by the statute, both of which are key to understanding the whole point, which is to allow litigation based on the application. It's the application, just like in Hatch-Waxman, that crystallizes the controversy. And so in the situation, and it provides two acts of infringement, and if I can just point to them, they're in E2C of 271, so that's on page 5A. One is in the instance where the parties engage in the information exchange, which applicants are highly incentivized to do. If there's any fear of any patents that might block your product, an applicant is going to go through the information exchange. Could the company with the product file a declaratory judgment action when they don't know what you're going to do? Do they have a good faith basis for believing you're going to infringe if they don't have the application to look at until they get discovered? Yes, Your Honor. Tell me how. Okay. Well, first I want to say Congress obviously thought they did because it created in the text an artificial infringement act for that very thing. Two, and they're right. By definition, a biosimilar is highly similar to the reference product sponsor's product. So a reference product sponsor would have good faith basis in that case to bring suit on any patent that covers its own product or any patent that covers a use of its own product. But it doesn't know the specifics of the biosimilar. I mean, by definition, the biosimilar is similar. It's not identical. And whether or not it infringes might have something to do with the ways in which it is different. It might, Your Honor. But the question is whether or not you have a good faith basis to sue. And given the standard of highly similarity and the kinds of similarities there have to be, if the sponsor has any patent that covers its product, the product itself, or any uses of the product, it would have a good faith basis to sue, which is exactly what Anjan did here. Well, you're suing saying this thing infringes our patent. You don't even know what this thing is. You know that the applicant has submitted to the FDA, using your data, to produce a product that's highly similar to your product. Is the way this statute works, Ms. Maynard, that if I have a valid patent, I sue? Yes. Yes, exactly. Is that it? I mean, I don't know. I'm asking. Is the practice that, given that these will all be similar, if I have a valid patent, I bring litigation? Right. Exactly. And Congress provided for this exact situation in E2C, which is on 5A of our blue brief, made someone applying and not providing the application within 20 days, made that precise act an act of infringement. And you would have a good faith basis to sue, as they did here. I don't know if I agree with you on that, but you would have to sue. That's the problem, right? What would the patent litigation look like? I have this patent. You're bringing this biosimilar. I'm going to sue you. The litigation would decide whether the biosimilar infringes the patent, and that would have something to do with whether or not it's sufficiently, whether it's too similar or whether it's certainly distinct. And what your argument means is that if you have the patent, Justice Kagan said, you have to sue. No, you're right. No? You don't have to sue. I'm sorry if I misunderstood your question. I'm just asking as a matter of practice that, in fact, that's the way people operate under this statute, that given the similarity of these products, if I believe I have a valid patent, that the patent hasn't lapsed, I'm going to bring a suit. That is exactly what Amgen did here. And I want to emphasize that in most situations, applicants will go through the process because the information exchange, and they have in most situations. So this is the only situation in which I'm aware where it was approved by Amgen. I'm sorry. If the biosimilar files a notice of intent to file the application and a copy of the application, if it complies with all of the steps in Phase I, does it stop the licensed product holder from seeking a declaratory judgment of action? Yes, Your Honor. So if — until you get to a certain point in the process, right? So if the — the way that it works is, if the applicant does provide, so does participate in the information exchange, then they go through a back-and-forth exchange. During that period of time, the L9A bar — and if you'd like me to walk you through it, I can explain why. But the L9A bar would bar anybody bringing in declaratory action during that exchange. Well, that's assuming good faith. And that's the next question, which is, if the biosimilar doesn't comply, you're saying the other side can sue. But what happens if you do comply, and the other side fails to? They don't give you the notice that they're required to. They don't do something that's required on their part in that exchange process. What is your biosimilar's remedy in that case? The statute provides powerful incentives for the sponsors to continue through the process. All incentives have a way of failing. Well — Just look at our society. So — Yes. But the consequence, if they — to answer your question, if the sponsor doesn't follow through on the information exchange and then doesn't file the L6 lawsuit, so at stage L6 it says the sponsor shall sue within a certain period of time. If the sponsor doesn't bring that suit, it's limited in any future infringement suit to reasonable royalties. That's the provision in E6A of 271 on 8A. And I think — but this is one whole ecosystem. It's complicated to be sure, but Congress took into account all these situations. Can you explain the difference? There are two rounds of patent infringement, right, round one. Can you explain the difference between those two? And with respect to Justice Breyer's question, you started out by saying all of this is about early resolution of patent litigation. So which would be the agency that's involved? Your answer was the Food and Drug Administration. What about the Patent and Fademark Office? Well, just to clarify to the — Mr. Chief Justice's questions and Justice Breyer's questions, Justice Ginsburg, I don't believe FDA would have, or the Patent Office, has rulemaking authority to interpret these provisions. So — but in the — I don't think that will solve the problem. I think this is a statutory interpretation question, and I think the text answers — Yes, but you don't need explicit regulatory authority. There are many situations where you defer to an agency's determination. They can have informal — you know, you all know all that. So I would stick with the idea of the FDA doing this first, but maybe I can't get there. And if I can't get there, I'm stuck. I think the text answers these questions that I'm being asked. May I go back and answer Justice Ginsburg's question about the way that the two phases work? First, Your Honor, there's not always two phases. So even if the parties engage in the information exchange, it contemplates — it gives the sponsor of — I mean, the applicant a great deal of control. The applicant can put all of the patents on the list into that litigation. And if that happens, they may never be in need for a second litigation if there are never any new patents. That's what happened in the Apotex case that's pending. There are no patents left, yet Apotex is subjected to the 180-day bar of the Notice of Commercial Marketing provision. So — and the purpose of the Notice of Commercial Marketing provision, Justice Ginsburg, is that it lifts the gate. So once the parties go through the information exchange, as Justice Sotomayor was suggesting, that creates a stay of any litigation except for the ones the parties agree to. The sponsor has great control over that first litigation. The point of the notice is to allow the sponsor to litigate any other patents it might have before the exclusivity period runs out. And it — and the notice does two things — does two things. It lifts the gate to allow the sponsor to bring any declaratory judgment actions, and it also says, if appropriate, the sponsor may seek a preliminary injunction. But, of course, if you file an early enough declaratory judgment action, you don't need a preliminary injunction. It's a very powerful remedy that the statute has given to the sponsors. Mr. Chief Justice, I see I'm already into my — am I into my extra rebuttal? If I — Yes. May I reserve the time? Yes. Thank you. Mr. Yang? Mr. Chief Justice, and may it please the Court, Congress enacted a detailed process for early resolution of patent disputes through patent infringement litigation while FDA is evaluating a biosimilar application. The statute expressly establishes a series of procedural steps and then specifies the consequences for both the applicant and the sponsor if they fail to take the steps that would set you off the L path. And all of those consequences address the timing and the scope of patent litigation. Those consequences, which are quite detailed — we don't have the time to talk about all of them, but they're in the statute, they're in our brief — are the exclusive consequences. It would be — it would muck up the statute for courts to come in and start policing each step of the L dance and then send the parties back. The whole idea of this is — Justice Breyer's question and my question is the same. The FDA is involved intimately. Page 32A of the brief is the subsection K application information. Not later than 20 days after the secretary notifies the applicant that the application has been accepted, the applicant shall provide. Now, this means that the agency gives the notice for 20 days, and it seems to me certainly it would be within its authority, or it would be a sensible thing, for it to say, and we have a regulation, if you don't do that, and we've told you to do that, we're going to delay the review process. I actually think it's not so clear. If you compare this to the Hatch-Waxman Act, and I believe you had an opinion called Carrico about that not so long ago, that actually embeds the FDA in the process of identifying patents. It has the orange book. This is quite a different process. The FDA is involved with the licensure, but Congress at this point separated FDA. FDA was actually petitioned to do some rulemaking in this context, and it declined to do so because of those differences. So we ultimately still are here about a statute. Do we have your assurances that this is the FDA's position? It is the FDA's position. It is the PTO's position. It's in a consistent position in other situations. I don't know if it gets opinion letters. Well, they've not issued opinions on how this works, so I don't know of anything that's inconsistent. In any litigation, have they taken a different position? No, nothing I know of. Mr. Yang, you indicate that L9 is the exclusive remedy for a 2A violation. Close. All right, well, let me know where I get it wrong, or at least I understand that's the primary position of your side. But Amgen sought relief under state law, and I didn't take it that the petitioner argued preemption in any way, shape, or form. So where does that leave us? L9 might otherwise be the exclusive or almost exclusive mechanism, but what happens when we have a claim under state law that no one's argued is preempted? Well, I believe Sandoz argued, at least in the Court of Appeals, that it was preempted. But putting that to a side, the Federal Circuit in this case deemed the state law claim for the injunction to be moot. This is at page 24A and 25A of the Joint Appendix. It did so because it found a Federal injunction and opposed a Federal injunction to enforce the statute. That's precisely what the Federal Circuit made even more clear in the subsequent decision in Apotex. And so where we are now is only on a question of the Federal remedy if there is one for failing to give notice or failing to comply with the information exchange. I will say that there are strong arguments that this would be preempted. This is a highly detailed scheme, and if states were to start to interject different means of enforcing it on a state-by-state basis, it might wreak some havoc, but we've not taken a position on that. Exactly. I agree with you, but the absence of any argument on preemption is what makes it so curious. Well, the judgment below did not rest on the state law claim. Again, if you look at page 24 and 25 is where it says it's moot, it rests on a Federal law. Well, but it rests on a Federal law cause of action that also might not be there. In terms of the preemption question, it seems to me that it's very hard to give a comprehensive answer to the questions presented without considering whether, well, thanks for your opinion on what Federal law does, but in fact state law you can get the same injunction. It's really asking us to put together a puzzle where a big piece is missing. I don't think state law is a piece of the puzzle. Congress does not have the habit of enacting comprehensive statutes and then allowing states to fill it, figure out. Well, it becomes part. So are you arguing the preemption question? Well, we think that there are strong arguments. Again, we've not taken a vetted position on that because it's not been, as the case comes to the court, what the case is about. Do you think the statute can function in the way you're arguing, even if there are injunctions based on the state law provisions? Can the statute work? I think it would mess up the scheme that Congress, because if you were to look at shall, you know, there are eight subsections, that's clauses of subsection L. At each stage a court is policing and saying, no, no, no, you didn't give sufficient information, you didn't do that. You'd have a series of back and forth in the scheme. The whole idea is you go along a path and at certain points, if you don't do something, boom, you bump out, you're in litigation. So you're asking us, assuming, just an assumption for the sake of argument, that we rule in your favor and say, as you've asked us to say, that a declaratory judgment is the only remedy available and there is no federal injunction that's possible here. Do we vacate and remand for the court below to decide whether state law provides? No, I think the best way for the court to decide is what's required under the statute. The cause of action, if you do that, you'd leave open questions of state law and preemption. The cleanest way is just to resolve what the statute requires. I'm sorry. We say the statute says that. What are we doing? We're saying the state law is moot? No, because there's no state law claim. If you're complying with the federal statute, there is no state law claim. The state law would piggyback on federal law. I also want to address the question that the court had earlier about, you have to know what's licensed in order to identify your claims. If it's not preempted, how would it be mooted? It would just fail. Just like on L-2, the federal circuit said you're complying with federal law, therefore you have no state law claim because your state law claim is predicated on violating federal law. It would be the same for both. But that begs the question on the question we're not looking at. But it begs the question on the first point, which is, is it a requirement that the biosimilar applicant give over the application? It is certainly a requirement of the statute. The remedy may be file a declaratory judgment action. The exclusive remedy, and which would answer... That goes back to preemption. Well, no, I think that would answer, you would say that you are complying with the statute. It is a mandatory condition precedent to continue on the path to take all of these steps. But if you don't and the statute provides an off-ramp, you're not violating the statute. Congress contemplated that path. Now, on the question of licensure, remember you have to identify at the very beginning what all the patents are at the L-3 stage. One of the consequences is if the sponsor fails to identify the patents on the list, the sponsor can never bring an infringement action, period. This is 271 E-6 A and B. And so the consequence is that if you get at the end and you're like, oh, something is new, something I didn't think about, you have no artificial infringement action because the list was established. The problem is you take her reading. There's language supporting it, but you can read that word notice. Gee, if you read it tough, you can't work it. But that's the language. Now, look at the next one, B. Okay, A, whatever that thing is. Okay, once they give the 2, the Section 2 notice, no declaratory actions, they're all frozen. Ah, until you give the notice of marketing. And so all they have to do is, number 1, day 1, they give the Section 2 notice, send them all the information. On day 2, they give the commercial notice, and all of a sudden, everybody's free to give declaratory judgments. That's right. Yeah, that's right, and that's what it's supposed to be. That's what it's supposed to be, Is there a system that was supposed to set up a system where you put tremendous incentives on people to negotiate and to work it out in an orderly way that you can just gut it by simply filing your commercial notice on day 2? There are strong incentives. For instance, if the applicant doesn't give the information in the forefront, the L2 information, the applicant is barred. No, he'll give it. He'll give it. Well, if he gives the information... Then all the declaratory courts come in and everybody jumps in on day 2. That's your view? No, you would still go through the L3 exchange. In order to... If you look at this provision that you're talking about, which is L9C... Okay, I'll read the next paragraph. You can't do that in oral argument. I'm just illustrating to you one of the many things I don't understand and why it seems to me this would work out a lot better if you could somehow get this to rulemaking. Thank you, Counsel. Thank you, Mr. Jensen. Mr. Waxman? Mr. Chief Justice, and may it please the Court, Congress did not create detailed procedures for resolving biosimilar disputes and repeatedly use the word shall merely to have applicants who choose to take advantage of the statute's benefits and use the sponsor's information then disregard those mandates. I think I'm inclined to be guided on which of the many complicated aspects of the statute to talk about by the Court's questions. It's tempting to just stand up and give a tutorial on this extremely complicated situation. Perhaps I'll phase the question. I'll pose the question for you, okay? As I understand, I've got your position, which is that they have to give notice after the FDA approval, correct? Yes. On the 8A issue, they have to give notice. Wouldn't that stop Phase 2 litigation from starting immediately? By your definition, they could go the biosimilar and the licensed product could go all through Round 1. They've now narrowed their dispute. I thought Round 2 involved disputes about other patents, not the ones that they narrowed. And so wouldn't your reading always force Round 2 into the post-licensed 12-year period? I thought the whole purpose of the statute was to get Round 1 and Round 2 done and done before the 12-year period was finished. No. The purpose of the statute, assuming that it's followed, that is, that 2A is complied with and the information exchange occurs, is to have all patent litigation concluded before commercial launch. And that is, in fact, what was said over and over again. No, no, no. You still haven't answered my question. I'm still getting warmed up. You're assuming commercial launch has to be 12 years plus 6. I'm assuming that commercial launch should be 12 plus 1 because you only have an exclusive license for 12 years. So let me address the 12 years plus 6 months first and then go to the point of why the notice of commercial licensing has to, can only coherently be done once the FDA has announced what molecule has been approved for what therapeutic uses and by what manufacturing processes, which is of paramount importance when you're talking about biosimilars. So as to the 180, the 12 versus 12.5 years, the FDA, no one has yet applied for biosimilar licensure until long after the 12 years has ended. So we don't know when the FDA, how the FDA will address a license application that is made during the 12-year period. Two panels of the Federal Circuit have read the language of the statute that says, and this is 262K7, that FDA's approval of a biosimilar may not be made effective until 12 years of data exclusivity has run. Two panels of the Federal Circuit have said that only means made effective. The FDA certainly could adjudicate a license and grant a license effective 12 years after the exclusivity period runs. The reason is my argument. Because if the FDA is taking that position, then it's basically kicking off the possibility of round two pretty early. Yes. Now, as my friend on the other side pointed out, the notion that there's going to be round two litigation very early in any event is unlikely for the following reasons. Number one, as they've reported, it takes about 10 years even for a biosimilar to get developed. And, you know, Amgen is both a reference product maker and a biosimilar maker, and that's, in fact, consistent with our experience. So the notion that there's going to be, you know, an application filed in year four or year six or year eight is unlikely. Another reason that it's unlikely is these biosimilars, you know, up until very, very recent advances in gene sequencing, biosimilars, the way they were defined, was by the process under which they were made. You take a particular cell line, and then you do the following 18 things at this atmospheric pressure, and the FDA will not approve a biosimilar until it has inspected the manufacturing process and facilities, which according to the record is about $100 or $200 million. And the notion that a biosimilar is going to create a whole factory for the FDA to review and then leave it open until year 12 is quite unlikely. The issue here, even if the FDA took the position that, nope, even though the statute only says that approval can't be made effective, we're not even going to tip our hand until 12 years is over, it still wouldn't defeat the manifest purpose of this statute. This statute, like the Hatch-Waxman Act, has two relevant periods. There is a period of data exclusivity, that is the period in which a competitor can't use the sponsor's data. That's not a period of market exclusivity. In fact, there is a competitor to the product at issue in this case that's been on the market for five years because Teva went through the regular 271A process. So we have, as in Hatch-Waxman, a period in which there's data exclusivity. And we then have a period, just like in Hatch-Waxman, there it's 30 months, here it's 180 days, for the adjudication of any patent disputes. Now, my friends on the other side say, well, this is different, because in the Hatch-Waxman context, the FDA actually approves, and then the 30-month period for patent litigation occurs. Whereas here, the FDA's approval, leave aside the question of when they can or can't approve it, if they don't approve it until sometime after the 12 years has run, there's an additional 180 days. We don't know that because this has never happened, but even if it did, the reason why you have to have the FDA say what's being approved, whereas in Hatch-Waxman you don't, is in Hatch-Waxman, we're talking about a small molecule that has to be identical. It's made by chemical synthesis. So there's no question, when a generic asks for Hatch-Waxman approval, we know precisely what the molecule is. We know precisely for what therapeutic purposes it will be used, because it has to be identical. And no one cares what the manufacturing process is, because this is simply chemical synthesis of an identical molecule. Whereas, and this goes to Justice Breyer's question about notice, until the FDA decides what it is, what is the compound that it is going to authorize, which by definition won't be identical, and until it decides for what therapeutic purposes that will be used, and until it specifies what the manufacturing process in what location will be approved, you can't give notice of anything. And in fact, if you look again, we're on the 180-day notice provision, subsection A of 262L8, which I'm sorry, I'm looking at my own appendix, but it's on page 31A of my appendix. 8A says the notice of commercial marketing. Subsection B, entitled preliminary injunction, tells you the most important consequence of 8A. And this does go again, I think, Justice Sotomayor, with respect to your question about how soon this can be done. That 8A notice, first and foremost, allows the sponsor, for the very first time, to seek a preliminary injunction against the commercial marketing of the product for the uses using the processes. And you cannot go to a federal district court and ask for a preliminary injunction until you know, A, that there's an imminency that occurs. You can't go years in advance. B, you have to know what it is that you are seeking to enjoin. This notion that there's some artificial act of infringement that relates to whatever you may or may not know is in the original application, for Article III purposes, is irrelevant. I mean, once the FDA, the question is, can you get an injunction against what is approved for what purposes using what processes? Until you know that, a court doesn't have a way of evaluating what it is that's being enjoined. How often is the issue the validity of the patent rather than its infringement? We don't have a sufficient data set to be able to evaluate it because, you know, in the seven years that this Act has been in place, the FDA has accepted for review only 14 of these applications and has only granted five of them, the last one being last Friday. And so in some of them there have, you know, for example, Amgen got approved, a biosimilar approval for its biosimilar to AbbVie's reference drug Humira. We got that last year. We haven't given the 180-day notice yet, and so we haven't started commercial marketing. And it could be because often the biosimilar will wait until the expiration of the regular relevant patents. It also can be that there is this litigation occurs, phase one, phase two, or whatever, and that there is then a settlement, which is in fact what happened between Amgen's reference product in this case and Teva's competitor. There was litigation, and the litigation was settled. But the point here, and if I can just maybe this is a good point to shift to the L2A issue, which is the requirement that you provide, that once the applicant decides not to go the regular route, that is the A route, that is to do all the testing and prove that this is safe, potent, and pure, but instead to piggyback onto the reference products. Once that's done, the statute says, not only in 2A, but also in 1A, says that you must, once you make that choice, the consequence of using the reference product sponsor's data is, if I can just quote 1B, quote, when a subsection K applicant submits an application under subsection K, such applicant shall provide a copy of its application and information about its manufacturing process. Let's say I spot you that. Okay, the 2A, shall means shall, all right? But the question still remains under L9C, what the remedy is. And we've heard from the other side that the exclusive remedy is a declaratory judgment action. And how can we possibly decide what 2A means without taking a peek at 9C as to what remedies are permitted? Well, what, I mean, we agree with the government that when 2A says shall and when 1B says shall, that is a mandate. I'm spotting you that for purposes of this question. Okay, I just want to make sure that... It's hard to divorce a right from its remedy, isn't it? And to understand the contours of the right. And if 2A gives you a certain right to information, we don't usually understand the right in the context of the remedy provided. And here the remedy is 9C. So let me, can I bookmark the state law cause of action? Because I do want to get back and explain... Our best. Okay, let me do state law first, which is what was at issue and was adjudicated here, and then go to the federal law issue. So the litigation, the complaint in this case asked for an order under the California statute. The California statute, like many other state statutes, including the one that was directly at issue in your decision in Bates v. Dow AgriScience, makes it a violation of state law to fail to comply with federal mandates. Including this one. I got that. Okay. I'm sorry. My question is, how can we understand what a violation is of federal law without looking at both the right section and the remedy section? Because a violation is circumscribed in a certain way here by the remedies provided by federal law. So I don't... This may be a definitional failure of communication, but shall either means shall. The remedy question is, who, if anybody, can do anything about it if you don't comply with shall? That's... No, it's not quite that. Shall is, if you want to invoke this federal process, this is what you have to do. Okay. Right? So if you don't invoke the federal process, what remains? That's not a remedy. That's a different federal process, the declaratory judgment process. That's what C says. Under your reading, B and C become superfluous because if you can get a state law information exchange provision under C or under state law, why give the remedy of starting a declaratory judgment action at all? Okay. All right. So let me go right to Section 9. I'm not trying to avoid it. Section... You have to look what Section 9 says. 9C is, if you will, an exception or a clarification of 9A. The background principle is that Congress has established an artificial act of infringement, which is the submission of the ABLA, the submission of the biosimilar application. That is actionable. There is a federal cause of action under Section 281, which gives federal district courts jurisdiction to adjudicate patent disputes. Under the Declaratory Judgment Act and this Court's decision in Metamune v. Genentech, you can bring a declaratory judgment any time you want, so long as there is a level of immediacy, which by definition there is if an artificial act of infringement has already occurred. Now, what 9A says is, notwithstanding those background rules, if the biosimilar applicant chooses the K route and provides the application and the manufacturing information, we're making an exception to the general availability of declaratory judgments. No one can file a declaratory judgment action until the notice of commercial marketing is given. What 9C simply does is, 9C says if you don't provide that 2A information, you, the applicant, can't ever file for a declaratory judgment action. But 9C doesn't remedy the sponsor's harm for two reasons. Number one, it has no real operative effect with respect to the sponsor, because recall what 9A, the 9A limitation is implicated, as the first clause indicates, only in those circumstances in which the application and the manufacturing information is provided. And 9C simply confirms what should be obvious, which is if it isn't provided, the sponsor is left to his background rights to litigate the declaratory judgment action. So why haven't you driven us to the following conclusion, which will be unsatisfactory, again, from everybody's point of view? You're right. Setting the bar pretty low for me. You're right. Shall means shall. Okay? But let's stop there, because, first, the federal part, which you just read, doesn't say whether that's the only remedy or that there are others. But even if it did, we wouldn't know whether California law picked up just the substantive part or the substantive plus the remedy. And even if we knew that, we wouldn't know whether some other state would be free to pick up in their own state law shall but not exclusivity as to remedy, and those involve either preemption questions or questions of interpretation of state law, and none of that is briefed. And, therefore, we stop. Shall means shall. How do you like that? No, you don't. No, I like shall means shall. I still want to get back to make the 9C point, but let me address your state law question first. We know, without question, this California Supreme Court in Rose v. Bank of America and the Solicitor General's amicus brief to this court in that case makes clear what California says. California law is not incorporating into state law federal remedies. It says it is a violation of our state law, fair commercial practices law, to violate a command of another sovereign's law. Well, that's fine, but we also have pretty well-established preemption laws. You know, this is a very reticulated statute with enormous consequences, and you're reading along, and you finally figure it out, and all of a sudden, up pops California law. And not only that, I mean, if we apply California law, then presumably in some circumstances we apply the law of every other state, and maybe they reach different consequences. And if, as your friends on the other side are right, that there's no federal cause of action for this type of relief, then it seems odd to say, but there's going to be, you get the same thing under state law. Well, let me address that head on. Not to prejudge the issues, maybe. First of all, the preemption question, there's no ambiguity about whether preemption was waived. At page 26A of the decision... Oh, no, I understand that, but I'm not going to interpret a federal statute based on the decisions of one party to waive the argument or not. I completely understand that. In Bates v. Dow AgriScience, the court rejected my argument that the farmer in question had a remedy under, I believe it was, Texas state law for the violation of a substantive... Texas state law made a violation of state law a violation of a substantive provision of the federal FFRA statute. And I argued in that case for the defendant that Congress had considered what remedies, if any, to provide to individual farmers and had made an advertent decision not to provide any. This court pretty emphatically rejected my argument and said that because Texas had made it a violation of Texas law to fail to comply with a provision of the federal FFRA, the plaintiff could get a remedy available under Texas law. Now, here, I mean, the... There's nothing... I mean, I agree that we... You know, it's somehow unsatisfying to say, well, the only... The injunction that was sought, the order that we went in to say, look, you have to order them to give us this manufacturing information and give us notice at a time when it's coherent to talk about notice about what, and we... The only remedy that the California statute provides is injunctive relief. It doesn't allow for damages at all, and we're entitled to this. We're a California company. They're violating our laws. I understand that it's unsatisfactory and that ultimately, someday, perhaps, this court will have to decide whether there is a federal enforcement, even if state law didn't exist yet, although I do want to suggest that if this court says, look, shall means shall, and you must... If you choose to parachute onto the back of their information, you have to at least let them know that you're doing it and what you're doing, and in order to give them notice in time for a court to... Really, this state law would end up, under your theory, forcing a biosimilar to invoke phase one because at every stage, you, where they choose to opt out, they... You would just run to court and say, my state law remedy is force them to take the next step. Give me the application, then identify, then do this. You're going to... There's no longer a choice. So, Justice Sotomayor, two points. Number one, in terms of, shouldn't all this patent litigation be done early and often? Everybody understands that the applicant, the biosimilar applicant, under this phase one, phase two process, alone decides which patents and issue in the exchange of lists are going to be adjudicated. The applicant announces, the applicant can say to the sponsor, in phase one, we're going to litigate all of the patents that are on the L3 lists. The only qualification is if the applicant says, I don't want to litigate any of these things now. I want to wait and see what's approved. The sponsor has the election of choosing one patent, presumably the patent on the molecule itself, to adjudicate. So, it is in the applicant's hands to get all of this litigation on artificial acts of infringement up front. All you're saying to me is that there's built-in incentives for the applicant to invoke and participate in phase one. What you're not telling me is it's no longer a choice. So, let me explain... Because state law can force them, through you seeking injunctions, to participate unwillingly. Okay. Let me go back to nine, which I think is the source of Sandoz's argument that the statute already provides remedies for the two violations that we allege occurred here. And, if I may, let me address the two substantive provisions differently, because they say that 9b is the remedy for a violation of the 180-day notice, and 9c is a remedy for the violation of not providing the information. The notion that 9b is a remedy for the failure to provide a 180-day notice is crazy. What 8a says is you can't file a declaratory judgment action until you get the notice. And what they say is, well, but the remedy of not giving notice is that you can file a declaratory judgment action. And not only that, you can file a declaratory judgment action, and you must file a declaratory judgment action, at a time when you don't know when, if ever, the FDA will approve, what it will approve, or for what purposes and by what means. And, if there is a violation of the 180-day notice period, the first time that the sponsor is going to know about it is when the FDA approves. What's wrong with that? Why can't you argue that the notice is defective and seek a declaratory judgment on that basis, that the notice is insufficient, doesn't provide you with adequate notices required by statute? Well, that, of course, is exactly what we claimed. They gave, they purported to give us notice the day after they filed their application. We said, that's not valid. That's not the right time. The question, I'm separating out the substantive question of when notice has to be given. I understand that. And the remedy. If you say the notice itself is defective, apart from when it's given, because it doesn't provide enough information, isn't that a possible remedy right there? Well, yes. In an instance in which the notice simply says, we are going to begin commercial marketing in 180 days, no less than 180 days. Our, the, you know, the issue in this case is, the substantive issue, I'll leave aside the enforcement question, is that's not notice. In order to notice something, you can't provide notice of something when you don't even know it's going to happen. That is, notice, ordinarily, and for that matter, logically, implies that the preconditions that are outside your control have been satisfied. If I say, this notice early tells you what? It tells you, I filed an application, and if they approve my application, I intend to start marketing immediately. I don't know whether they will approve my application. I don't know if they approve it, whether they will change the substance, whether they will change the indications. But isn't that true of a lot of what this Act contemplates? All the round one litigation can occur before the approval is given. That's right, and that's the reason why you have to have, and that's why 8A has to, the notice has to come at a time when we know what it is that's approved. That is, the parties may choose. I guess what I'm saying is that it seems as though this statute contemplates that you can do a lot of this process prior to the approval. But that's not a necessary piece of information you need in order to start evaluating whether there's infringement. So, Justice Kagan, the, let's say Phase I starts. I mean, I think I probably ought to talk about what happens, their remedy for not providing the L2 information at all. But let's say the parties decide, okay, we've each listed all of these patents that are potentially applicable. That list is coherent if the sponsor knows what the application and what manufacturing processes are there for. If we don't know that, we have to list every patent that we have on every manufacturing process that we own, which is incoherent. But let's assume that the parties say, okay, here's a list of patents. How many does it make sense for us to adjudicate now? It certainly makes sense for us to adjudicate the patents on the molecule and perhaps the purposes of the molecule. Maybe we think it makes sense to get a court to adjudicate all of them. But even in that instance, number one, under the statute in L7 recognizes that the sponsor may well obtain other patents after the lists are exchanged. That has happened in this case and in the Apotex case that my friend was addressing where they said there are no other patents available, it is about to happen in that case too because the PTO has just allowed claims that read on that patent. So number one, there can be and often will be other patents. Number two, even if you adjudicate, get an adjudication on the artificial act of infringement, number one, if you follow the process, the sponsor gets a mandatory injunction under 273 D1 D4. And in any event, if it turns out that what the FDA has said is, well, you know, there have been a lot of it, we require lots and lots of amendments to the application. In this case, there were 30 amendments made from the time the application was filed until it was granted. If it turns out that when the FDA issues its license, it's licensed something materially different than what the application was, the parties and the district court have to have some opportunity to say, wait a minute, I mean, we adjudicated patent infringement on the assumption that the manufacturing process would be X, Y, and Z, but the FDA didn't approve it. They insisted on A, B, and C, and there has to be some period, and that's what the 180 days does, to allow the parties to say, even with respect to the Phase I patents, we now have a real dispute. The FDA has approved something different than what the application was, and the sponsor has to be given some period of time in order to figure out what the FDA has approved, and a district judge has to be given some period of time to evaluate, like, what are these patents, what is this patent infringement,   what is this patent infringement. I'm sorry, Mr. Faxman. Assume that there's been Phase I, Round I, and Round II before the approval. The district court has decided one of two things. There is a patent infringement. It's issued an injunction. The FDA has narrowed the scope of things substantially. If the applicant was seeking the world, and the FDA is the one who narrowed it, why isn't it fair to the licensed product holder to let that injunction continue until there's now certainty that there isn't? If the patent infringement process ended up saying no infringement, district court agreed, and there's no injunction, so the licensed product is going to deal with goods in the market, but they've gotten a shot at this, and the claims are now even worn out. They've lost on all the wider ones. I'm not sure what unfairness there is to the license. If you go through the process the way it's anticipated. Number one, we've not had a situation, and it is remarkably unlikely that we will get to a situation in which there are no patent disputes left to be resolved once the license issues, both because, as has happened with respect to our product that issue in this case, and in the Apotex case, the PTO has indeed issued us a patent that bears on this that we couldn't include in the list. Number two, everybody needs some time to be able to figure out what the FDA period does, is give us the reference product sponsor an opportunity to figure that out. I mean, we have to, HC requires the parties to cooperate and expedite discovery once the preliminary injunction is filed so that we can figure out, for example, what manufacturing processes the FDA has  place. Thank you. Thank you, Your Honor. There can be no doubt that the judgment that we've petitioned on is a federal judgment. The Federal Circuit issued a federal injunction and dismissed their state law claims. Two, the statute, Congress, when it wanted to provide for an injunctive relief of the L procedures, it did so. It provided for it in only one instance, violations of the confidentiality provisions in L1H. And significantly, that's also the only provision that Congress called a failure to do something in L1, a violation. Yet Amgen wants you to read the statute and to read the rest of the provisions as implicitly entitling them to an injunction that    provisions in L1. So that's the way to read the statute. The rights here are patent rights. The remedies they  were patent remedies and they're forceful. They gave them artificial infringement actions in the case where you participate in the exchange and in the case where you don't. Congress shows no concern in the notice of commercial marketing provision with notice being too early. It says at least 180 days. And when you lift the gate it allows the sponsor to go to court and litigate any remaining patent rights they have. Justice Breyer, Congress knew how to require something to come after one event and before another. It does it in the very next provision. L8B does not do it in the notice provision. You shouldn't read that requirement into the word license which is just the description of the biosimilar. Congress would not have extended 12 year exclusivity period in such a bizarre way. That was a very hotly debated item. And it would extend the exclusivity period in every case  there are no patent rights to litigate. Our approach fully allows them to vindicate their patent rights. We wrote them and told them to sue us. They delayed but they could have sued us right away. That was the provision Congress allowed. In that suit they got our application, they requested as common in patent cases to request all of our F.D.A. correspondence. We have a duty to continue updating them. They were issued a new patent during the suit. They added that patent to the suit which is also common in patent litigation. A lot of what they are telling you blinks reality about the way the world works and with respect those kinds of policy arguments are for the Congress. This statute works if you just apply it according to its terms. The shall conditions are all conditions precedent. That is made clear by the L6 provision which says they shall sue. It would be a very odd federal law to say you can only get a reasonable royalty. These are shalls. The government says they don't mean must in all circumstances. They mean must if you want to continue in this process. If you don't continue in the process there are benefits and burdens to both the applicant and the sponsor at every step. If you go through the statute and I recognize it is a very articulated scheme it is all one coherent whole and it gives them a very powerful remedy. Thank you counsel. Case is submitted.